UNITED STATES of America, Appellee,

v.

Joseph ARGENCOURT, a/k/a Joe Black, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Rodney J. ANDREONI, Defendant, Appellant.

Nos. 92–2196, 92–2197.

United States Court of Appeals, First Circuit.

Heard May 6, 1993.

Decided June 23, 1993.

Edward C. Roy, East Greenwich, with whom H. Robert Beecher, Providence, RI, was on brief, for defendant, appellant Joseph Argencourt.

James A. Ruggiero, Providence, RI, for defendant, appellant Rodney J. Andreoni.

Margaret E. Curran, Asst. U.S. Atty., with whom James H. Leavey, Asst. U.S. Atty., and Lincoln C. Almond, U.S. Atty., Providence, RI, were on brief, for appellee.

Before BOUDIN, Circuit Judge, COFFIN and OAKES,* Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

Defendants Rodney Andreoni and Joseph Argencourt were charged in a two-count in-

* Of the Second Circuit, sitting by designation.

dictment alleging their involvement in a cocaine distribution scheme. Both men were convicted on Count 1, which charged a conspiracy to distribute more than 500 grams of cocaine. Only Andreoni was convicted on Count 2, which charged an attempt to distribute the same quantity of the drug. Each appeals his conviction on various grounds. We affirm.

### I.

We shall begin with a brief description of the facts, as the jury could have found them, adding more detail in later sections as necessary to explain our conclusions.

The events underlying this case began in early 1991, when the Federal Bureau of Investigation (FBI) initiated an undercover operation to probe insurance fraud in Rhode Island and Massachusetts. Andreoni was one of the targets of the investigation. An undercover FBI agent, Gary Brotan, and an FBI informant, Mark Vermyea, met some 60 times with Andreoni over a period of approximately one year. During one of their discussions, Brotan raised the topic of cocaine. Andreoni said that he could provide substantial quantities of the drug.

In the course of several recorded conversations between March 28, 1991, and August 5, 1991, Andreoni described one of his sources as an individual from Pawtucket, Rhode Island, named "Joe Black," which is an alias used by Argencourt. On August 26, Andreoni, Argencourt, Brotan and Vermyea attended a meeting at a restaurant in Seekonk, Massachusetts. The conversation, which was recorded, began with introductions, followed immediately by Andreoni's statement to Argencourt, "Tell him what the ... prices are right now." Argencourt responded without pause, "Twenty eight." Supp.App. at 33. It is undisputed that this price referred to a kilogram of cocaine.

The discussion at the meeting also touched on Argencourt's cautious approach to drug dealing. Argencourt reported that he previously had left drug trafficking "because of all the heat." Supp.App. at 36. He said that he had been set up by an informant who was wearing a wire, and he had not insisted that Brotan and Vermyea be checked for wires only because Andreoni said they could be trusted. Id. at 36–38. Argencourt said he would kill anyone who "cops out" on him, and noted that he had shot the informant who had worn the wire. Id. at 38.

The four men discussed the proposed cocaine transaction, and eventually the deal was set for the upcoming Friday, August 30. Id. at 53–55. Although no location was specified then, Andreoni and Argencourt arranged in a phone conversation Thursday evening to meet at 9:30 a.m. on Taunton Avenue in East Providence. Id. at 65. Brotan, Vermyea and Andreoni met Friday morning at the designated time and place, but Argencourt never appeared. An FBI agent conducting surveillance reported seeing Argencourt's car, however, near the appointed location, at about 10 a.m. Tr. Vol. I at 104–06. The agent, who identified the car by its license plate number, did not get a look at the driver. A few minutes later, the agent saw the car parked a short distance away, but he was unable to see if anyone was inside.

After the other three had waited for a while, Andreoni, at the urging of Brotan and Vermyea, telephoned Argencourt's office to find out why he was late. Andreoni first reported back that he had spoken to Argencourt's secretary, who told him that Argencourt had not returned from a 9:30 appointment. Supp.App. at 71. After continuing to wait a substantial period of time, the three men called off the deal and left.

Andreoni, Brotan and Vermyea met again on September 9, at which time Andreoni suggested an alternative way of getting cocaine. Id. at 82–83. Another meeting was held October 8. Andreoni told the government agents that no one was selling cocaine because they were nervous. Id. at 84–86. He also reported that Argencourt would not return his phone calls.

The two defendants were arrested in early 1992 and charged with conspiring to distribute the one kilogram of cocaine that had been the focus of the August 26 meeting and August 30 rendezvous. No cocaine ever was seized.

## II.

■ Both defendants claim that the evidence was insufficient to support their conspiracy convictions. They claim that the conversation during the August 26 meeting, although focused on a possible cocaine deal, was vague and noncommittal and failed to demonstrate the intent necessary to form an agreement to distribute the charged amount of cocaine. *See United States v. O'Campo,* 973 F.2d 1015, 1019 (1st Cir.1992) (describing elements of conspiracy).

■ The well-established standard for evaluating sufficiency claims requires us to review the evidence as a whole, including all reasonable inferences from that evidence, in the light most favorable to the government. *See, e.g., United States v. Tejeda,* 974 F.2d 210, 212 (1st Cir.1992). If, in so doing, we find that a rational trier of fact could find guilt beyond a reasonable doubt, we have no option but to affirm the jury's verdict. *Id.* We may not weigh the evidence, and all credibility questions must be resolved in favor of the verdict. *United States v. Ortiz,* 966 F.2d 707, 711 (1st Cir.1992).

While we recognize that this case is unusual in that the government recovered no cocaine from these defendants nor any other physical evidence of drug dealing, we believe the tape-recorded conversations and other circumstances were sufficiently telling to support the jury's determination. Beginning in March 1991, Andreoni repeatedly assured Brotan and Vermyea that he could arrange to purchase cocaine for them, and he mentioned Argencourt as one of two possible suppliers. Argencourt appeared at the August 26 meeting with Andreoni, and, without hesitation, stated the price for a kilogram of cocaine. A jury easily could find that the defendants came to the meeting intending to consummate a deal with the two government agents.

The fact that the final details—the time and location of the transaction—were not set until after the meeting does not undermine the jury's conclusion that a conspiracy was formed. *See, e.g., United States v. Iennaco,* 893 F.2d 394, 398 (D.C.Cir.1990) ("There need not be a specific agreement as to price, quantity, and time, place and manner of delivery.") Indeed, the evidence permitted the jury to find that Andreoni and Argencourt consulted and agreed upon those details during a conversation the evening before the scheduled August 30 deal. *See* Supp.App. at 65, 72. The jury also reasonably could have found that the admittedly cautious Argencourt arrived at the scene of the planned transaction at the designated time but decided against making the delivery because he detected something amiss.

This case is unlike *Iennaco,* heavily relied upon by Argencourt, where the court reversed a conspiracy conviction because it found only "various unaccepted offers and much tentative talk," 893 F.2d at 398. The defendants here discussed with the interested purchasers a specific one-kilogram, $28,-000 cocaine deal that was to take place on a particular day. Subsequent actions and statements by the two defendants confirmed—or so the jury could have found—that deal. We consequently find no basis for disturbing the jury's verdict on the conspiracy count.[1]

## III.

■ Andreoni also challenges the sufficiency of the evidence supporting his conviction on Count 2 for attempt to distribute cocaine. To prove attempt, the government must establish both an intent to commit the substantive offense and a " 'substantial step towards its commission,' " *United States v. Chapdelaine,* 989 F.2d 28, 33 (1st Cir.1993) (quoting *United States v. Figueroa,* 976 F.2d 1446, 1459 (1st Cir.1992)). This step must be " 'more than mere preparation' " but " 'less than the last act necessary before the actual commission of the substantive crime,' " *Chapdelaine,* 989 F.2d at 33 (quoting *United States v. Manley,* 632 F.2d 978, 987 (2d Cir. 1980)).

---

1. For the same reasons, we affirm the district court's denial of Argencourt's motion for new trial. *See United States v. Rothrock,* 806 F.2d 318, 321–22 (1st Cir.1986) (disposition of new trial motion will not be disturbed on appeal "unless the court abused its discretion or misapplied the law").

The evidence described in the preceding section adequately establishes Andreoni's intent to commit the substantive crime. We think it beyond debate that he also engaged in the substantial step necessary to corroborate his intent. After arranging the meeting at the restaurant on August 26, Andreoni nailed down the details of the transaction in a conversation with Argencourt and communicated the information to Brotan and Vermyea. Andreoni hooked up with the two government agents at the appointed time, and waited for a substantial period with them for Argencourt's arrival. He called Argencourt's office in an effort to find out about the delay. The jury reasonably could have found that Andreoni had taken the transaction to the brink of completion, and that it failed to occur only because of Argencourt's last-minute caution. This certainly was enough to establish an attempt.

### IV.

■ Argencourt challenges the district court's denial of his mid-trial motion for severance, which was based on the introduction of evidence of other crimes committed by Andreoni. The evidence at issue concerned Andreoni's solicitation of arson. Andreoni's lawyer initially elicited testimony about arson from Agent Brotan in an effort to develop the defense theory that Andreoni had pretended to comply with Brotan and Vermyea's plans because he feared they would harm or kill his family. Through his cross-examination, the lawyer established that Brotan and Vermyea had portrayed themselves as dangerous individuals willing to commit violent acts, and that Vermyea had told Andreoni that burning buildings was his specialty. Tr. Vol. I at 79, 89–90.

On redirect, the prosecutor asked Brotan about the arson discussions he had had with Andreoni. Brotan testified that Andreoni had suggested that Brotan and Vermyea might be hired to burn both a Providence restaurant belonging to Andreoni's brother and the house of an attorney whose wife had been awarded the home in a divorce settlement. According to Brotan, Andreoni had

indicated that it did not matter if the wife was in the house at the time it was burned.

■ Argencourt's severance motion was premised entirely on this arson testimony. See Tr. Vol. I at 162.[2] The court's decision to deny the motion is reversible only upon a strong showing of prejudice, demonstrating a manifest abuse of discretion that denied the defendant a fair trial. See United States v. Olivo–Infante, 938 F.2d 1406, 1409 (1st Cir. 1991); United States v. Boylan, 898 F.2d 230, 246 (1st Cir.1990).

Argencourt has not met this standard. As an initial matter, his attorney failed to object to Brotan's testimony when it was given. This fact was noted by the district court, see Tr. Vol. I at 162, and, in our view, suggests that the evidence had less-than-monumental significance to Argencourt's case. More importantly, the lawyer did cross-examine Brotan at some length for the purpose of establishing that Argencourt was not involved in Andreoni's other criminal activities, including arson, and the agent's testimony unequivocally excluded Argencourt from those crimes. See Tr. Vol. I at 101–02. The record thus provides no basis for a finding of prejudice. Consequently, we affirm the district court's denial of Argencourt's severance motion.

### V.

■ Andreoni claims that the district court erred by allowing into evidence testimony concerning his efforts to obtain firearms for Brotan and Vermyea. We think it apparent that the testimony had a reasonable connection with issues in the case and, given its relevance, the district court's weighing of the value of the evidence against its prejudicial effect fell within the trial judge's discretion. See United States v. Spinosa, 982 F.2d 620, 628 (1st Cir.1992) (admission of prior bad acts evidence is reviewed only for abuse of discretion).

It is well established that, under Fed. R.Evid. 404(b), evidence of prior bad acts is not admissible to show bad character or propensity to commit a crime, but may be admit-

---

**2.** The trial also included testimony about other criminal conduct by Andreoni, see Section V infra, but the severance motion made reference only to the arson activity.

ted when it has some "special," non-character based relevance.[3] *United States v. Arias–Montoya,* 967 F.2d 708, 709 (1st Cir.1992). In this case, a primary defense theory was that Andreoni, throughout his relationship with the government agents, was merely puffing, making wild and unfounded promises that he had no ability or intention to fulfill. Andreoni wanted the jury to believe that the proposed cocaine deal was no more than big talk by an expert bragger.

■ Evidence that Andreoni did follow through on obtaining guns for Brotan and Vermyea strikes at the heart of this theory and, consequently, had significant probative value for a purpose other than showing criminal propensity. *See Figueroa,* 976 F.2d at 1454 (other acts evidence admissible to corroborate matters significant to the prosecution's case). Our caselaw establishes that such evidence is admissible unless its value is "substantially outweighed" by the risk of unfair prejudice, confusion, or waste of time. *See, e.g., Arias–Montoya,* 967 F.2d at 710; Fed.R.Evid. 403. No such imbalance occurred here. Although the evidence certainly was prejudicial, nothing about it was unfairly so. *See Spinosa,* 982 F.2d at 628. The jury knew, from other testimony, that Andreoni was involved in criminal activities other than the alleged cocaine dealing. More-

over, when the firearms evidence first was elicited from Brotan, the district court gave a limiting instruction advising the jury that it was admissible "only for the purpose of disclosing what relationships were between the parties...." *See* Tr.Vol. I at 99.[4] We therefore reject this claim of error.[5]

## VI.

■ During deliberations, the jurors asked to rehear the tape recording of the conversation that took place on August 26 among the defendants and the two government agents. Argencourt argues on appeal that the district court erred in acceding to their request.[6]

■ We repeatedly have held that the decision to reread or replay testimony during jury deliberations rests in the sound discretion of the district court. *See United States v. Akitoye,* 923 F.2d 221, 226 (1st Cir.1991) (citing cases). The factors to be considered are "the reasonableness of the request, the ease or difficulty in compliance, and what is likely to be gained or lost." *Id.*

With these factors in mind, there is no doubt that the district court acted well within its discretion. The jury's request was specific and easy to accommodate. The conversa-

---

**3.** Fed.R.Evid. 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident...."

**4.** The firearms testimony was elicited twice during the trial, first from Brotan during redirect examination by the prosecutor and later from Andreoni when he testified as a defense witness for Argencourt. When Brotan testified, Andreoni's counsel objected to the evidence as irrelevant, and it was at that time that the district court instructed the jury of the limited appropriate use for the evidence. *See* Tr.Vol. I at 99. When the testimony was elicited a second time, from Andreoni, the attorney raised a specific 404(b) objection. In overruling that objection, the trial judge noted Andreoni's defense that he was "play acting." *See* Supp.App. at 114–15. There was no request for a limiting instruction at that time, and none was given.

**5.** In light of our disposition, we do not address the government's suggestion that Andreoni's

404(b) objection was untimely. Nor do we consider Andreoni's cursory reference to the government's failure to give pretrial notice of its intent to use the firearms evidence. This issue was neither raised below nor briefed meaningfully on appeal.

**6.** The tape recording for August 26 was introduced into evidence in two parts. One cassette contained a recording of the two-minute interval between the time the recorder was activated in the parking lot of the restaurant and the beginning of the conversation inside the restaurant. The other tape contained the conversation. Both tapes had been played for the jury, and the court ordered that both be replayed in response to the jury's request during deliberations.

Although his brief is unclear, we believe Argencourt intends on appeal to challenge the replaying of both tapes. Regardless, we see no need to dwell on this ambiguity or to delve into the issue of waiver, raised by the government, because we think it manifest that the court acted properly. *See infra.*

tion the jury sought to revisit was the most significant piece of evidence presented by the prosecution, particularly against Argencourt, and providing the jury with a second chance to digest it strikes us as fully appropriate. Indeed, the jurors' desire for a repetition is likely to reflect an appropriate concern that the conversation be evaluated as carefully as possible. We see no likelihood that the jury gave it undue emphasis.

## VII.

■ Both defendants argue that the district court erred in calculating their offense levels based on one kilogram of cocaine. Although they do not dispute that one kilogram was the amount negotiated,[7] they claim that there was insufficient evidence . that they were capable of actually producing such a large quantity of the drug. Under the Sentencing Guidelines, they assert, the amount of drugs involved in an uncompleted transaction may be considered only if the evidence shows the defendants intended to produce, and were reasonably capable of producing, that amount. *See* U.S.S.G. § 2D1.1, comment. (n. 12).[8]

This argument has some facial appeal because, as Andreoni argues, "during the entire transaction, no drugs were seized, no samples were given, no money exchanged for drugs and no distribution of drugs was made." Brief at 27. Andreoni had no history of drug dealing and Argencourt stated during the August 26 meeting that he had been out of the business for some time.

The claim fails upon closer scrutiny, however, because it is, in essence, simply a reiteration of the sufficiency of the evidence argument. Although the defendants claim that the one-kilogram amount used by the district court is too high, they do not say what amount the district court properly could have used for calculating their offense levels. In our view, their objection is really to the jury's finding of guilt, and to the court's endorsement of it through sentencing.

■ This is not to say that a finding of guilt in a conspiracy case, by itself, binds a court to the amount explicitly negotiated by the defendants. A jury's supportable guilty verdict may establish that the defendants intended to produce the quantity at issue, which in turn is at least some evidence of a capacity to produce it. It is not, however, conclusive. Application note 12 permits the court to hold the defendants responsible for a lesser quantity, notwithstanding their specific negotiations, if the court is unpersuaded that the defendants actually intended and could have provided the full amount.

. The application note does not help defendants in this case because the evidence suggests the capacity, as well as the intent, to sell one kilogram of cocaine. The taped negotiations demonstrated the defendants' knowledge about the drug trade and revealed that Argencourt had significant past narcotics experience. *See* Supp.App. at 33–36. Andreoni's efforts to obtain firearms for the agents suggested real criminal-world connections. In accepting the one-kilogram amount as a realistic reflection of the defendants' culpability, the district court relied specifically on the fact that Argencourt, at the time of this offense, was out on bail on state drug charges.[9] That the state charges involved significantly smaller amounts of cocaine than

---

7. Andreoni explicitly acknowledges that one kilogram was "the negotiated amount of drugs," *see* Brief at 26. Argencourt makes no argument that the government or court misunderstood the amount being discussed in the tape-recorded conversations.

8. The note states, in pertinent part:
   [W]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

Until November 1992, when the Guidelines were amended, this statement appeared in § 2D1.4, comment. (n. 1).

9. According to Argencourt's presentence report, the incidents underlying the state charges occurred in November 1990 when, under surveillance by Pawtucket police, a confidential informant made three purchases of cocaine from him. Two counts alleging delivery of cocaine ultimately were dismissed, and he was sentenced on a single count of possession of a controlled substance.

the one kilogram does not undermine the crucial fact of prior access to the drug. These circumstances taken together amply support the district court's finding that defendants intended to provide, and were capable of providing the negotiated amount of cocaine. *See United States v. McCarthy*, 961 F.2d 972, 978 (1st Cir.1992) (sentencing court's determination of drug amount reviewed only for clear error).[10]

Thus, this claim, like the others, is unavailing.

*Affirmed.*

10. The circuits have not been uniform in their treatment of application note 12. A conflict exists over whether the government bears the burden of showing intent and capacity, or whether the defendant bears the burden of showing a lack of intent and capacity, *see United States v. Barnes*, 993 F.2d 680, 680–83 (9th Cir.1993) (citing cases), and some confusion exists over whether the court is required to exclude a negotiated amount only where the defendant lacked *both* the intent *and* the ability to complete the drug transaction, *see United States v. Brooks*, 957 F.2d 1138, 1151 & n. 11 (4th Cir.1992). These issues were neither raised nor of significance here. Even assuming the government had the burden, the evidence was sufficient to support the district court's finding that defendants intended *and* could produce the negotiated amount of cocaine.