16 F.3d 401
NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
 UNITED STATES, Appellee,
v.
Johnny Betances DIAZ, Defendant, Appellant.
 No. 92-1535.
 United States Court of Appeals,
First Circuit.
 January 4, 1994
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
 Justin Levin for appellant Johnny Betances Diaz.
 Geoffrey E. Hobart, Assistant United States Attorney, with whom A. John Pappalardo, United States Attorney, and Jeffrey A. Locke, Assistant United States Attorney, were on brief for appellee.
 D.Mass.
 AFFIRMED.
 Before Breyer, Chief Judge, Rosenn,* Senior Circuit Judge, and Cyr, Circuit Judge.
 Rosenn, Senior Circuit Judge.
 
 
 1
 Appellant Johnny Betances Diaz was tried to a jury and convicted in the United States District Court for the District of Massachusetts for conspiracy to possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) and 846. He appeals his conviction and contends that: (1) the evidence introduced against him was insufficient to support the guilty verdict returned by the jury, (2) the district court erred in admitting a hearsay statement made by a co-conspirator, and (3) the district court improperly denied his motion for a severance. We affirm.[1]
 
 I.
 
 2
 As recounted in United States v. Matiz, a companion case decided contemporaneously herewith, this case arose out of a large scale investigation conducted by various government agencies in the United States and Colombia, South America into the cocaine distribution activities of a number of individuals. The United States (the Government) had the assistance of Pedro Alvarez, a defendant in another criminal matter.
 
 
 3
 Alvarez, at the behest of the Government, posed as a purchaser and contacted a number of cocaine suppliers in Colombia. Negotiations ensued over several months pertaining to the purchase of large quantities of cocaine. In the early part of 1991, the suppliers in Colombia informed Alvarez that they were experiencing temporary difficulties in smuggling the cocaine into the United States. In light of these difficulties, they asked Alvarez to assist them in transporting the shipment. Additionally, the suppliers asked Alvarez to store and distribute the cocaine to their associates.
 
 
 4
 The Government instructed Alvarez to request an up-front payment from the suppliers of $30,000 for his troubles and expenses. Reluctantly, the suppliers agreed and told Alvarez that the payment would be made by one of their New York based associates, "La Negra," a code name for Nancy Esperanza Matiz.
 
 
 5
 Alvarez and Matiz ultimately scheduled a meeting for May 23, 1991, for Matiz to hand over the money to an associate of Alvarez, actually Special Agent Dominick Lopez, at a Burger King restaurant in Queens, New York. Matiz, however, failed to appear at the scheduled hour. Only after Matiz twice contacted Diaz at his residence did she finally arrive together with him, two hours late, in a Nissan Pathfinder.
 
 
 6
 As Lopez approached the vehicle he stated the code word for the transaction, "Cubito." Diaz replied "Cubita," apparently correcting Lopez's use of the masculine form of the word. After Lopez entered the vehicle, Matiz instructed Diaz to get the money. Diaz, without receiving instructions regarding the location of the money, retrieved it from underneath the seat of the car and passed it to Matiz who then gave it to Lopez. In response to Lopez's query regarding the amount of money contained in each bundle, both Matiz and Diaz disclosed the correct amount.[2]
 
 
 7
 After this exchange, Matiz remained in close contact with Alvarez. She informed him that she was personally expecting to receive a large portion of the cocaine shipment upon its arrival. Upon learning the date on which the shipment consisting of 615 kilograms of cocaine would arrive, Matiz placed nine telephone calls of short duration to Diaz.
 
 
 8
 After the cocaine shipment arrived, Alvarez called Matiz on numerous occasions to discuss the details of the pickup of her portion of the cocaine. During these conversations, Matiz expressed her desire to obtain her share as soon as possible. Initially, she also voiced an interest in purchasing some of the cocaine that Alvarez had received as his fee for transporting the cocaine. Ultimately, however, she decided against it because of financial constraints.
 
 
 9
 Finally, Alvarez informed Matiz that she would be able to collect her allocation of the cocaine on June 12, 1991. Alvarez reserved a hotel room for Matiz under an assumed name in Middleboro, Massachusetts near the site for the transfer of the cocaine. Matiz arrived at the hotel on June 10, along with Diaz who also used a false name and fictitious address to check in. The following evening, Alvarez and Matiz met at the hotel to review the final arrangements for the pickup. A number of Matiz's assistants, who had arrived at the hotel on the same day as Matiz, were designated to collect the cocaine.
 
 
 10
 At the time of the pickup, one of Matiz's assistants followed an undercover agent to the warehouse where the car was loaded. Matiz, however, remained behind at the hotel with another undercover agent, Dillon, who was to accompany her to a meeting with Alvarez to discuss future cocaine shipments. Before departing, Matiz introduced Diaz to Dillon as her husband. She then informed Diaz that "the boys" had gone to load the car. Diaz asked how long the loading would take and offered his own estimate regarding the length of the task. As Matiz was leaving, Diaz wished her a successful meeting. In the car, Matiz and Dillon decided to purchase a bottle of champagne to celebrate the deal. On the way to the liquor store, Dillon asked Matiz whether Diaz minded that she met with other men late at night, as they had done the night before. Matiz responded that Diaz did not mind, that he understood that Matiz was working, that he was aware of the business, and that he liked the money. Shortly after an agent placed Matiz under arrest, another agent arrested Diaz outside the hotel.
 
 II.
 A. Sufficiency of the Evidence
 
 11
 Diaz first contends that the evidence produced at trial does not show that he was a member of the conspiracy. Essentially, he claims that he was merely present at the time of Matiz's activities but did not participate in them.
 
 
 12
 In evaluating a claim of insufficiency of the evidence, we "review the evidence as a whole, including all reasonable inferences from that evidence, in the light most favorable to the government." United States v. Argencourt, 996 F.2d 1300, 1303 (1st Cir. 1993). In addition, both direct and circumstantial evidence must be credited on appeal. United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993). Thus, as long as a jury could rationally find guilt beyond a reasonable doubt, we have no choice but to affirm. Argencourt, 996 F.2d at 1303.
 
 
 13
 Although, as the district court acknowledged, the evidence against Diaz was "thin", it nevertheless was sufficient to convict him beyond a reasonable doubt. Contrary to his assertions, Diaz did more than just passively and innocently accompany Matiz in her dealings with respect to the cocaine purchase. He exhibited a knowledge of and participation in the conspiracy. For example, at the encounter with agent Lopez, Diaz acknowledged the correct code term for the transaction. He also retrieved the money without receiving instructions pertaining to its location and stated the correct amount in each bundle. In addition, at key moments of Matiz's involvement with the cocaine purchase, she communicated with Diaz. Furthermore, on the day of the cocaine pickup, Diaz revealed his familiarity with the cocaine shipment when he asked about the length of the trip and offered his own estimate of the time it would take to complete the task. The reasonable inference to be drawn from this evidence is that Diaz was intimately involved with Matiz in planning and executing the conspiracy. Finally, Matiz explicitly told agent Dillon that Diaz knew she was working, was aware of the business, and that he liked the money. Based upon the admitted evidence, a jury reasonably could have concluded that Diaz knowingly participated in the conspiracy rather than merely acting as a disinterested bystander.
 
 II.
 B. Statement of Co-Conspirator
 
 14
 Diaz next maintains that the district court erred in admitting, pursuant to Federal Rule of Evidence 801(d)(2)(E), Matiz's statement implicating him in the conspiracy. He argues that the statement was not made in the course of or in furtherance of the conspiracy.
 
 
 15
 To admit a co-conspirator's statement as an exception to the hearsay rule, a court must find that "it is more likely than not that the declarant and defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). The district court conducted a Petrozziello hearing and found these facts by a preponderance of the evidence. We must accept the district court's finding unless the finding was clearly erroneous. See United States v. Patterson, 644 F.2d 890, 894 (1st Cir. 1981).
 
 
 16
 A co-conspirator's statement is made in furtherance of a conspiracy if it " 'tends to advance the objects of the conspiracy as opposed to thwarting its purpose.' " United States v. Masse, 816 F.2d 805, 811 (1st cir. 1987) (quoting United States v. Fahey, 769 F.2d 829, 839 (1st Cir. 1985)). On the way to a meeting with Alvarez to discuss future shipments of cocaine, Agent Dillon inquired whether Diaz, who was introduced as Matiz's husband, minded the late night meetings with other men. Understood in this context, the purpose of Dillon's inquiry was to determine the extent of Diaz's role in the conspiracy. Matiz answered that Diaz knew what was going on and was pleased with the money. This statement was made during the conspiracy and tended to further its goals because it provided Dillon with some measure of assurance that Matiz could carry out her end of the conspiracy without obstruction on the part of her husband.[3]
 
 C. Severance
 
 17
 Finally, Diaz argues that the district court erred by denying his motion for a severance. He argues that severance was necessary in order to safeguard against prejudicial spillover. Spillover occurs "where evidence establishing the guilt of one defendant, but not admissible against the other, may create an atmosphere clouding the jury's ability to evaluate fairly the guilt or innocence of the latter." United States v. Perkins, 926 F.2d 1271, 1281 (1st Cir. 1991).
 
 
 18
 We review the denial of a severance motion under Fed. R. Crim. P. 14 for abuse of discretion. United States v. Innamorati, 996 F.2d 456, 469 (1st Cir. 1993). A district court's decision not to sever can only be reversed upon a defendant's maintenance of the heavy burden of showing substantial prejudice amounting to a miscarriage of justice. Id. Substantial prejudice, however, is extremely difficult to prove where, as here, there are obvious reasons of economy in trying Diaz with his co-conspirator Matiz. Fed. R. Crim. P. 8(b). "Co-conspirators are customarily tried together absent a strong showing of prejudice." Perkins, 926 F.2d at 1280. Evidence regarding the acts of Matiz would have been admissible against Diaz even in a separate trial, as co conspirators are liable for all of the criminal acts carried out in furtherance of the conspiracy. See United States v. Ortiz-Arrigoitia, 996 F.2d 436, 440 (1st Cir. 1993). Moreover, the court's instructions to the jury that the guilt of each defendant must be determined individually provided a further safeguard against the spillover effect.[4] Thus, Diaz has failed to show substantial prejudice because of the joint trial.
 
 The judgment of the district court is
 
 19
 Affirmed.
 
 
 
 *
 Of the Third Circuit, sitting by designation
 
 
 [1]
 The district court possessed subject matter jurisdiction pursuant to 18 U.S.C. Sec. 3231. This court has jurisdiction pursuant to 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742(a)(2)
 
 
 [2]
 The sum amounted to only $20,000 and Matiz promised to make an additional payment of $5,000 the next day, explaining that she had been told that the amount due was $25,000
 
 
 [3]
 Moreover, in light of the other evidence, albeit circumstantial, introduced at trial implicating Diaz as a member of the conspiracy, any error accruing from the admission of the statement would be harmless
 
 
 [4]
 The court warned the jury as follows:
 And I will throughout refer mostly to the defendant, and I will explain to you later on that as to one part of this case, you must be very sure to view the evidence as to each separately, because each is entitled to separate consideration from you....
 Now, here it is very important that you review the evidence as to each separately. The government has to prove as to each of them that he or she knowingly and willfully joined the unlawful scheme, with the understanding of its unlawful character.