June 21, 1994 UNITED STATES COURT OF APPEALS
 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 94-1097

 UNITED STATES,

 Appellee,

 v.

 CHRISTIAN GOODCHILD,

 Defendant, Appellant.

 

 ERRATA SHEET

 The opinion of this court issued on June 8, 1994, is amended

as follows:

 Page 8, line 13: Add close quote after "device."

 Page 25, last line of the second quote: Change "e" to "be."

 UNITED STATES COURT OF APPEALS

 FOR THE FIRST CIRCUIT

 

No. 94-1097

 UNITED STATES,

 Appellee,

 v.

 CHRISTIAN GOODCHILD,

 Defendant, Appellant.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF NEW HAMPSHIRE

 [Hon. Joseph A. DiClerico, U.S. District Judge]
 

 

 Before

 Selya, Circuit Judge,
 

 Bownes, Senior Circuit Judge,
 

 and Boudin, Circuit Judge.
 

 

Vincent J. D'Elia for appellant.
 

Jean B. Weld, Assistant United States Attorney, with whom Paul M.
 

Gagnon, United States Attorney, was on brief for appellees.
 

 

 June 8, 1994
 

 BOWNES, Senior Circuit Judge. Defendant-appellant,
 BOWNES, Senior Circuit Judge.
 

Christian Goodchild, was indicted on one count of using two

unauthorized access devices, i.e., two Discover credit cards
 

issued on two separate accounts, and obtaining goods and

services within a one-year period with a value in excess of

$1,000, with intent to defraud, in violation of 18 U.S.C. 

1029(a)(2).1

 After a jury trial, defendant was found guilty.

She was sentenced to eleven months incarceration, a three-

year term of supervised release, and ordered to pay

restitution of $10,090.52 to Discover Credit Card Services,

Inc. This appeal followed.

 We consider the following issues:2 (1) whether

the government proved each and every element of 18 U.S.C. 

1029(a)(2) beyond a reasonable doubt; (2) whether the

district court erred in admitting certain evidence; (3)

 

1. 18 U.S.C. 1029(a)(2) provides:
 (a) Whoever 
 . . .
 (2) knowingly and with intent to defraud
 traffics in or uses one or more
 unauthorized access devices during any
 one-year period, and by such conduct
 obtains anything of value aggregating
 $1,000 or more during that period;
 shall, if the offense affects interstate
 or foreign commerce, be punished as
 provided in subsection (c) of this
 section.
 . . .

2. Appellant has eight numbered issues in her brief. We
have consolidated them to five for purposes of our review.

 -2-
 2

whether defendant's conviction was due in part to the

ineffective assistance of counsel; (4) whether the

prosecutor's conduct warrants a reversal; and, (5) whether

there was error in applying the sentencing guidelines.

 SUFFICIENCY OF THE EVIDENCE
 

 Our standard of review is firmly established:

 We assess the sufficiency of the evidence
 as a whole, including all reasonable
 inferences, in the light most favorable
 to the verdict, with a view to whether a
 rational trier of fact could have found
 the defendant guilty beyond a reasonable
 doubt. We do not weigh witness
 credibility, but resolve all credibility
 issues in favor of the verdict. The
 evidence may be entirely circumstantial,
 and need not exclude every reasonable
 hypothesis of innocence, that is, the
 factfinder may decide among reasonable
 interpretations of the evidence.

United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir.
 

1991) (citations omitted). See also United States v.
 

Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993); United States
 

v. Argencourt, 996 F.2d 1300, 1303 (1st Cir. 1993), cert.
 

denied, U.S. , 114 S. Ct. 731 (1994).
 

 There are four essential elements of the crime for

which defendant was convicted: (1) that the two Discover

credit cards specified in the indictment were "access

devices" within the meaning of 18 U.S.C. 1029(e); (2) that

defendant used the credit cards without authorization during

any one-year period and obtained anything of value

aggregating $1,000 or more during the time period; (3) that

 -3-
 3

defendant acted knowingly, willfully, and with intent to

defraud; and (4) that defendant's actions affected interstate

commerce. See United States v. Ryan, 894 F.2d 355, 356-57
 

(10th Cir. 1990).

 We now turn to the trial record. Defendant's

father, Anthony Goodchild, died in an automobile accident on

September 15, 1988. In January of 1988, Anthony Goodchild

had applied for and received two Discover credit cards,

limited solely to his use. His application gave as his

address P.O. Box 398, Bristol, New Hampshire. The 1988

credit cards expired in January 1990. Discover was not

notified of Goodchild's death so it sent him two new cards,

numbers 2620 and 2471, on January 8, 1990, to the same post

office box address. The re-issue cards had the same

restriction as the original ones the sole use of Anthony

Goodchild.

 About two months after her father's death,

defendant rented the same post office box her father had

rented - box 398. Defendant notified the postmistress that

her mother, Anne, and her father could receive mail at the

post office box. Defendant's mother and father had been

divorced sometime prior to her father's death.

 At the time the two re-issue credit cards were

mailed to post office box 398, defendant was the only one

using the box. On January 16, 1990, defendant called

 -4-
 4

Discover, identified herself and asked that she be sent a

card on her father's credit account. No mention was made of

her father's death. Discover informed her that it could not

do this unless she forwarded a power of attorney authorizing

her use of the credit card accounts. Defendant proceeded to

make purchases with the cards limited to her father's use.

 Defendant used card number 2471 twenty-two times

between January 16 and February 23, 1990, to obtain things or

services of value aggregating $4,847.11. She used card

number 2620 thirty-five times between January 15 and

April 10, 1990, to obtain things or services of value

aggregating $7,137.43. Defendant made two minimum monthly

payments on card number 2620, $91.00 on March 3, 1990, and

$104.00 on March 19, 1990. These were the only payments she

made on either of the cards.

 On February 5, 1990, Discover security personnel

started an investigation of the use of card number 2471

because of transactions exceeding the charge limit. After

receiving no answer at the phone number it had for Anthony

Goodchild, Discover deactivated the card. On February 6 an

attempted use of the card at Nutri-System in Laconia, New

Hampshire, was blocked.

 The card account was then assigned to Discover's

collections department. It attempted to locate Anthony

Goodchild. The phone listed on his credit card application,

 -5-
 5

603-744-6591, was called on April 23, 1990, and a woman

informed the caller that Anthony Goodchild no longer lived at

that address. It learned from Anthony's former boss that he

had died "three to four years ago." Discover, on July 19,

1990, again called the number it had called previously. The

caller was told by the same woman who had answered the phone

on April 23, that she had had the phone number for a year,

that she did not know Anthony Goodchild, and that a Goodchild

lived in Alexandria, New Hampshire.

 Discover found a telephone number for defendant in

Alexandria, New Hampshire, 603-744-0157. The number was

called on July 19, 1990, and a message left on the answering

machine asking that the call be returned. A woman called

back. After identifying herself as Christian Goodchild, she

said a number of things. She told the Discover agent that

Anthony Goodchild had died in an automobile accident on

September 15, 1988, in Reading, Pennsylvania. She said that

there was a "long story behind the account sales" in January

and February, 1990. She went on to say that her parents were

divorced four months before her father's death and that after

he died "girlfriends started popping up" and her mother was

heartbroken. She told Discover that the attorney had paid

off "all credit accounts" through the estate, that the estate

was closed, and because she had fired the attorney handling

the estate for incompetence, there was no attorney to

 -6-
 6

contact. Defendant also volunteered that her father's latest

girlfriend, who was living with him at the time of his death,

was "Arline," last name and present whereabouts unknown.

After this phone call, the credit card accounts were referred

to the fraud unit of Discover, and eventually were turned

over to United States Postal Inspectors.

 There was independent evidence linking defendant to

the credit card transactions. An insurance adjuster, Terry

Seger, went to defendant's home on June 14, 1991, to

investigate her burglary claim of a loss in excess of

$70,000. Seger told defendant that he needed corroborating

information of the value of the items stolen. Defendant

submitted specific Discover card records of purchases on both

cards totalling approximately $3,362.12. The records showed

that these purchases were made in 1990. Defendant told Seger

that she had lived in her father's house since a month after

her father's death in 1988. She also told Seger that she

owned the Discover credit cards jointly with her father.

 Evidence was introduced showing that defendant was

a regular customer of Nutri-System Weight Loss Centers in

Concord, New Hampshire, in 1990. Purchases were made from

Nutri-System on card number 2620 on February 12, February 26,

and March 3, 1990, and one purchase on card number 2471 on

February 1, 1990.

 -7-
 7

 Based on our review of the record, focussed as

prescribed in the light most favorable to the verdict, we

find that the prosecution proved all four elements of the

crime charged beyond a reasonable doubt. There can be no

doubt that the Discover credit cards were "access devices"

within the meaning of the statute and defendant did not

challenge the judge's charge to this effect.3 Nor can any

serious challenge be made to the evidence showing use of the

credit cards by defendant. And it is clear that defendant's

use of the credit cards affected interstate commerce. The

one issue that requires further discussion is whether the

government has proven intent to defraud.

Intent to Defraud
 

 Under 18 U.S.C. 1029(a)(3) the government must

prove that a defendant "knowingly and with intent to defraud

traffics in or uses one or more unauthorized access devices"

. . . ." Section 1029(e)(3) defines "unauthorized access

device as follows:

 

3. 18 U.S.C. 1029(e)(1) defines "access device" as
follows:

 the term "access device" means any
 card, plate, code, account number, or
 other means of account access that can be
 used, alone or in conjunction with
 another access device, to obtain money,
 goods, services, or any other thing of
 value, or that can be used to initiate a
 transfer of funds (other than a transfer
 originated solely by paper instrument);

 -8-
 8

 the term "unauthorized access device"
 means any access device that is lost,
 stolen, expired, revoked, canceled, or
 
 obtained with intent to defraud; 

(Emphasis added.)

 The district court charged the jury as follows:

 The third element that the Government
 must prove beyond a reasonable doubt is
 that the defendant acted knowingly and
 with intent to defraud.

 The Government must prove beyond a
 reasonable doubt:

 (1) that Christian Goodchild obtained
 the Discover cards with intent to
 defraud, or that the credit cards were
 lost, stolen, expired, revoked or
 canceled; and

 (2) that she knowingly and with
 intent to defraud used the credit cards.
 

(Emphasis added.)

 The court also gave, at defendant's request, a

"good faith" instruction:

 Since an essential element of the
 crime charged is intent to defraud, good
 faith on the part of a defendant is a
 complete defense to a charge of credit
 card fraud. If the defendant actually
 believed in good faith that she was
 acting properly, even if she was mistaken
 in that belief, and even if others were
 injured by her conduct, there would be no
 crime. An honest mistake in judgment
 does not rise to the level of criminal
 conduct. A defendant does not act in
 good faith if, even though she honestly
 holds a certain opinion or belief, that
 defendant also acted with the purpose of
 deceiving others.

 -9-
 9

 While the term good faith has no
 precise definition, it means among other
 things a belief or opinion honestly held,
 an absence of malice or ill will, and an
 intention to avoid taking unfair
 advantage of another.

 The burden is on the Government to
 prove fraudulent intent and consequent
 lack of good faith beyond a reasonable
 doubt. The defendant is under no
 obligation to prove good faith.

It is clear that the jury was properly and evenhandedly

instructed on intent to defraud.

 Fraud is usually proven by circumstantial evidence.

Direct proof of a knowing intent to defraud is rare. See
 

United States v. Nivica, 887 F.2d 1110, 1113-15 (1st Cir.
 

1989), cert. denied, 494 U.S. 1005 (1990). As we said in
 

Nivica: "There is no pat formula for such proof; factual
 

circumstances may signal fraudulent intent in ways as diverse

as the manifestations of fraud itself." Id. at 1113.
 

 We now examine the evidence. Defendant points to

the following evidence and the reasonable inferences to be

drawn therefrom as establishing that she had no intent to

defraud Discover. She took out the post office box two

months after her father's death in September 1988, in order

to help the estate receive mail, for her personal use, and

the use of her mother. Defendant points out that in using

the credit cards she signed her surname as she did on other

credit cards held by her. She also asserts that she always

disclosed her proper name, address, phone number and driver's

 -10-
 10

license number. She emphasizes that she never denied using

the credit cards, and that she did make payments on the cards

from her own checking account. She states that she always

paid bills late. We have been unable to find any evidence

about defendant paying bills late, but will assume that there

is evidence to that effect or that it could be reasonably

inferred from other evidence. Defendant emphasizes that

during the time of the credit card charges she had been

appointed personal representative of her father's estate with

the consent of her mother and two brothers and that all the

expenditures were made with the approval of the attorney

representing the estate. Defendant also points out that she

was financially able to pay the credit card bills.

 We start our examination of the government's

evidence on intent to defraud with the telephone call from

defendant to Discover on January 16, 1990, in which she

requested, without mentioning her father's death, that she be

sent a card on her father's credit accounts and was told that

in order to do so Discover required a power of attorney

authorizing her to use the accounts. Defendant then

proceeded to use both cards, which were limited to her late

father's use, for credit purchases totalling $11,984.54. The

only payments made on the accounts were two minimum monthly

payments of $91.00 and $104.00 on card number 2620. Although

she was administrator of her father's estate during the time

 -11-
 11

she was using the cards, defendant never notified Discover

until mid-July of 1990 that her father had been dead since

September 15, 1988. When the insurance adjuster was

investigating defendant's claim of a burglary of her home,

she specified Discover credit card purchases of items that

she claimed had been stolen. She told the insurance adjuster

that she held the cards jointly with her father. This was

false and defendant knew it was false. There can be no doubt

that defendant had the wherewithal to pay Discover what was

owed. By the spring of 1990, defendant had received

distributions from her father's estate of approximately

$22,855. By the time of her indictment, defendant had

received $181,607 in estate distributions.4

 We conclude that there was sufficient evidence for

a jury to find beyond a reasonable doubt that defendant had

obtained the credit cards after they had expired on her

father's death, that she used them for her own benefit

knowingly and with intent to defraud, and obtained something

of value aggregating more than $1,000 during a one-year

period. Or to put it another way, the government proved all

the elements of the crime charged beyond a reasonable doubt.

 THE ADMISSION OF EVIDENCE
 

 

4. We can only wonder why defendant needed court appointed
counsel.

 -12-
 12

 Defendant hotly contested, on the grounds of

hearsay, the admission of "collection memos" of Discover

which contained the histories of the two accounts used by

her. The memos incorporated the substance of telephone calls

purportedly made by defendant to Discover. The basis of

defendant's hearsay objection to the memos was that neither

the person(s) who prepared the memo(s) nor the person(s) who

had the telephone conversation(s) or the person(s) who

maintained the records testified. The memos were admitted

under the business record exception to the hearsay rule, Fed.

R. Evid. 803(6). The telephone statements allegedly made by

defendant on July 19, 1990, were also admitted as an

admission under Fed. R. Evid. 801(d)(2). A detailed

exposition of the presentation of this evidence is necessary.

 Glen Hall, manager of fraud investigations for

Discover, testified as follows. The fraud investigation unit

often initiated investigations based on referrals received

from the collections department. Each referral contains a

record of what the collections department has done on the

account up to the date of the referral to the fraud unit.

This information includes any contacts with and statements

made by the cardholder. A referral also contains any

documentation on hand, including sales drafts, with the

customer's signature on them.

 -13-
 13

 The main activity by the collections department on

a delinquent account consists of telephone calls to locate

the cardholder. It is standard procedure for collections

personnel to log everything done. This is called "memoing

the account." All phone calls have to be "memoed." The

collections department uses its own shorthand system in the

memo record. Hall testified that he was familiar with most

of the shorthand system used. All of the account memos are

put into a computer. Each account memo can be printed out

when needed. Exhibits 12a, 12b, 12c, 13a, and 13b were

computer printouts of "collection memos" pertaining to

defendant's accounts. Hall explained how the printouts were

read and the meaning of the shorthand terms and symbols used

in them. Hall testified that the printout exhibits were

brought with him in response to a subpoena for Discover's

collections file. He also testified that these records were

kept in the ordinary course of business and stored on

Discover's computer.

 Defendant's hearsay attack focuses on the admission

of exhibits 12b and 13b. These computerized memos include

references to telephone contacts with a woman at the

telephone number listed on Anthony Goodchild's credit card

application. This woman referred the collections caller to a

person by the name of Goodchild living in Alexandria, New

Hampshire. As a result, collections obtained defendant's

 -14-
 14

phone number and left a message on her answering service.

Defendant objected to the introduction of this evidence. The

district court properly admitted the statement of the woman

that a person by the name of Goodchild was living in

Alexandria, not for the truth of the statement made, but to

explain what Discover did in response to it.

 It is not the case that all out of
 court statements are inadmissible as
 hearsay. The Federal Rules of Evidence
 make it quite clear that such statements
 are inadmissible only if offered for the
 truth of the matter therein. Fed. R.
 Evid. 801(c). We agree with the district
 court's decision permitting the
 introduction of the documents, on the
 ground that they were admitted, not for
 proving the truth of their contents, but
 to prove what steps were taken to
 investigate the circumstances surrounding
 the assault.

Morgan v. Massachusetts General Hospital, 901 F.2d 186, 190-
 

91 (1st Cir. 1990). This ruling applies with full vigor to

the telephone statements made by the unidentified woman.

 Defendant concentrates most of her objection fire

on telephone statements allegedly made by her on July 19,

1990, in response to Discover's request on her answering

service that she call. The statements were: that she

identified herself as Christian Goodchild; that Anthony

Goodchild had died in an automobile accident on September 15,

1988; that her parents were divorced four months prior to her

father's death; that after her father died "girlfriends

started popping up" and her mother was heartbroken; that the

 -15-
 15

attorney paid off all "credit accounts" through the estate;

that she had fired the attorney for incompetence in handling

the estate and the estate was closed; that her father had a

girlfriend living with him at the time of his death by the

name of "Arline," last name and present whereabouts unknown.

 The core issue is whether the computer printouts of

the collection memos containing records of telephone

statements made to Discover's collection personnel were

properly admitted under the business record exception to the

hearsay rule. Fed. 

 -16-
 16

R. Evid. 803(6) provides:

 (6) Records of regularly conducted
 activity. A memorandum, report, record,
 activity.
 or data compilation, in any form, of
 acts, events, conditions, opinions, or
 diagnoses, made at or near the time by,
 or from information transmitted by, a
 person with knowledge, if kept in the
 course of a regularly conducted business
 activity, and if it was the regular
 practice of that business activity to
 make the memorandum, report, record, or
 data compilation, all as shown by the
 testimony of the custodian or other
 qualified witness, unless the source of
 information or the method or
 circumstances of preparation indicate
 lack of trustworthiness. The term
 "business" as used in this paragraph
 includes business, institution,
 association, profession, occupation, and
 calling of every kind, whether or not
 conducted for profit.

 We find that the telephone statement memos meet the

strictures of the rule. They were reports or records made

either during the telephone conversations or immediately

following them. They were made and kept in the course of a

regularly conducted business activity, i.e., telephonic
 

investigations of delinquent credit card accounts. And it

was the regular practice of Discover to make a record of such

telephone calls.

 Although Hall did not make the records himself or

participate in the telephone conversations, we think he was a

witness qualified to explain the memos. He was the manager

of the fraud unit of Discover and understood both the

procedure followed by collections in investigating delinquent

 -17-
 17

accounts and the records required to be kept of such

investigations. There was no evidence indicating lack of

trustworthiness of the source of the information or the

circumstances of preparation.

 In rendering our ruling we are, of course, aware

 that the usual array of threshold
 questions pertaining to the admissibility
 of business records come within the ambit
 of the district court's discretion.
 These usual questions include, of course,
 questions as to whether a proper
 foundation was laid or whether sufficient
 indicia of trustworthiness were shown.

United States v. McGill, 953 F.2d 10, 13 (1st Cir. 1992).
 

 We are not persuaded by defendant's argument that

the memos were not business records, but prepared for

litigation. Records prepared by a debt collections

department are primarily made to enable the department to

track down debtors and collect money owed. This is not the

kind of record condemned in Palmer v. Hoffman, 318 U.S. 109,
 

113-14 (1943) which was a statement made by the engineer of a

train involved in an accident. The record here was not

prepared with an eye to litigation; its purpose was to

facilitate the collection of debts owed Discover. The Tenth

Circuit, in an analogous case, held:

 The government established at trial that
 the notes were contemporaneous with the
 [telephone] conversation, were part of
 the regular course of the loan
 counselors' business, and otherwise
 qualified as a business record under Rule
 803(6). Therefore, the district court

 -18-
 18

 did not abuse its discretion in ruling
 that the notes qualify as an exception to
 the hearsay rule.

United States v. Kingston, 971 F.2d 481, 486 (10th Cir.
 

1992).

 We find the telephone statements of defendant made

on July 19 to Discover were admissible under the business

record rule. 

 The district court also admitted as admissions

under Fed. R. Evid. 801(d)(2)(A)5 the July 19 telephone

statements made by defendant to Discover. We recognize, of

course, that normally statements by one not a party to the

business are not admissible for the truth of the matter

stated unless some exception other than the business records

exception is involved; the business records exception merely

avoids having to call the person in the business who had the

telephone conversation but does not justify admitting the

statements of the outsider for their truth. In this case,

the predicate for making the statements relevant is that the

jury could reasonably find that the statements were made by

the defendant. The evidence was that she returned a call

 

5. Fed. R. Evid. 801 (d)(2)(A) states:
 (d) Statements which are not hearsay. A
 (d) Statements which are not hearsay.
 statement is not hearsay if 

 (2) Admission by party-opponent. The
 (2) Admission by party-opponent.
 statement is offered against a party and
 is (A) the party's own statement in
 either an individual or a representative
 capacity . . . .

 -19-
 19

made to her number and identified herself. She then made

statements about Anthony Goodchild and his wife that only one

privy to the family history would know. The statements were

admissions because they could be used to identify defendant

and were properly admitted as such. Moreover, the judge gave

a cautionary instruction after the phone-call evidence was

admitted:

 Members of the jury, during the course
 of this witness's testimony you have
 heard certain testimony about notations
 or memos made in the business records of
 Discover concerning certain phone
 conversations. Before you can attribute
 any of those recorded remarks to the
 defendant, Ms. Goodchild, in this case,
 you must be satisfied from all of the
 evidence before you that the defendant
 was in fact the person who was on the
 other end of the telephone line and
 making those remarks.

 If you are not satisfied from the
 evidence that the caller was the
 defendant, then you must not attribute
 any of those remarks to her.

This cautionary instruction was clear and correct. It

advised the jury how the phone call evidence should be

approached.

 INEFFECTIVE ASSISTANCE OF COUNSEL
 

 Defendant mounts a lengthy and detailed argument

that trial counsel's poor performance resulted, at least in

part, in defendant's conviction. We follow our usual rule

and refuse to address the ineffective assistance of counsel

issue in the first instance. In United States v. Mala, 7
 

 -20-
 20

F.3d 1058 (1st Cir. 1993) we explained in detail the reason

for the rule:

 We have held with a regularity
 bordering on the monotonous that fact-
 specific claims of ineffective assistance
 cannot make their debut on direct review
 of criminal convictions, but, rather,
 must originally be presented to, and
 acted upon by, the trial court. See,
 
 e.g., United States v. McGill, 952 F.2d
 
 16, 19 (1st Cir. 1992); United States v.
 
 Natanel, 938 F.2d 302, 309 (1st Cir.
 
 1991), cert. denied, U.S. , 112
 
 S.Ct. 986, 117 L.Ed.2d 148 (1992); United
 
 States v. Hunnewell, 891 F.2d 955, 956
 
 (1st Cir. 1989); United States v. Costa,
 
 890 F.2d 480, 482-83 (1st Cir. 1989);
 United States v. Hoyos-Medina, 878 F.2d
 
 21, 22 (1st Cir. 1989); United States v.
 
 Carter, 815 F.2d 827, 829 (1st Cir.
 
 1987); United States v. Kobrosky, 711
 
 F.2d 449, 457 (1st Cir. 1983). The rule
 has a prudential aspect. Since claims of
 ineffective assistance involve a binary
 analysis the defendant must show, first,
 that counsel's performance was
 constitutionally deficient and, second,
 that the deficient performance prejudiced
 the defense, see Strickland v.
 
 Washington, 466 U.S. 668, 687, 104 S.Ct.
 
 2052, 2064, 80 L.Ed.2d 674 (1984) such
 claims typically require the resolution
 of factual issues that cannot
 efficaciously be addressed in the first
 instance by an appellate tribunal. See
 
 Costa, 890 F.2d at 483; Hoyos-Medina, 878
 
 F.2d at 22. In addition, the trial
 judge, by reason of his familiarity with
 the case, is usually in the best position
 to assess both the quality of the legal
 representation afforded to the defendant
 in the district court and the impact of
 any shortfall in that representation.
 Under ideal circumstances, the court of
 appeals should have the benefit of this
 evaluation; elsewise, the court, in
 effect, may be playing blindman's buff.

 -21-
 21

Id. at 1063 (footnote omitted). See also United States v.
 

Daniels, 3 F.3d 25 (1st Cir. 1993).
 

 PROSECUTORIAL CONDUCT
 

 Defendant charges that the "prosecutor's unduly

prejudicial and overreaching actions constitute plain error

and warrant a reversal of the action." We have read the

record carefully and have found no actions by the prosecutor

that even suggest conduct requiring reversal. It is true

that the prosecutor pushed hard during the trial for the

admission of evidence and to sustain his objections and he

was somewhat highhanded at times. But this is part of the

adversarial system. There was no conduct by the prosecutor

that was unethical, unfair, or which infringed upon the

constitutional rights of defendant.

 We are, however, bothered by a statement in

defendant's brief that is without support in the record. On

page 32 of defendant's brief there is the following

statement:

 In addition, during the prosecutor's
 closing his repeated use of the term
 "uncontradicted testimony" drew attention
 to the fact that Ms. Goodchild did not
 testify. Such references are grounds for
 reversal.

We agree that such a reference might well be grounds for

reversal and a new trial. But the prosecutor's argument did

not contain a single use of the term "uncontradicted

testimony," let alone repeated use of it. We expect

 -22-
 22

appellate counsel to read the trial record and represent

accurately in the brief and at oral argument what is

contained therein. Counsel should be aware that we read the

record, as well as the briefs, carefully.

 THE SENTENCING
 

 We are somewhat hampered in our consideration of

this issue because neither party ordered a transcript of the

sentencing hearing in this case. We proceed on the basis of

the presentence report and the judgment which includes the

court's statement of reasons for the sentence. Defendant

received the following sentence: she was committed to prison

for eleven months; she received a supervised release term of

three years; and she was ordered to pay restitution to

Discover in the amount of $10,090.52.

 Her sentence was arrived at as follows. Pursuant

to 2F1.1 of the Guidelines the base offense level (B.O.L.)

for a violation of 18 U.S.C. 1029(a)(2) is six. The court

found that the amount of Discover's loss was $10,090.52.

This increased the B.O.L. by three levels. Because the

offense involved more than minimal planning, the offense

level was enhanced two more levels. No other adjustments to

the B.O.L. were made. The defendant's criminal history

category was I. The imprisonment range for a B.O.L. of

eleven and a criminal history category of I is eight to

fourteen months.

 -23-
 23

 Defendant's main challenge to the sentence was the

court's determination that the victim's loss amounted to

$10,090.52. She argues that the loss was $9,160.27. If this

were the loss, under the applicable section of the

Guidelines, the imprisonment range would be six to twelve

months.

 The presentence report shows the amount of loss as

$9,160.27. The district court rejected this. In its

statement of reasons it said:

 The government objected to paragraphs
 10 and 11 of the addendum on the grounds
 that in calculating the loss to
 Discovery, [sic] late and finance charges
 should be included. If such charges are
 included, the loss figure is $10,090.52
 rather than $9,160.27 as determined in
 the report. The latter figure results in
 an increase of two rather than three
 levels to the base offense level. The
 court concluded that during the trial
 Glen Hall, a representative of Discovery,
 [sic] testified that the loss to
 Discovery [sic] was $10,090.52 and that
 figure was not challenged during the
 course of the trial. Therefore, the
 court established the lost [sic] figure
 as $10,090.52 which will result in an
 increase in three levels to the base
 offense level rather than two levels as
 indicated in paragraph 21 of the report.
 Paragraph 21 is amended to reflect a
 three level increase.

 Our standard of review follows two intersecting

standards. Valuation of loss is reviewed under the clear

error standard. United States v. Brandon, 17 F.3d 409, 456-
 

57 (1st Cir. 1994). But when "an appeal raises a purely

 -24-
 24

legal question involving the proper interpretation of the

sentencing guidelines, appellate review is plenary." United
 

States v. DeLuca, 17 F.3d 6, 7 (1st Cir. 1994). 
 

 The issue of "loss" valuation requires an

interpretation of Commentary 7 to 2F1.1 of the Guidelines

which states in pertinent part:

 7. Valuation of loss is discussed in
 the Commentary to 2B1.1 (Larceny,
 Embezzlement, and Other Forms of Theft).
 As in theft cases, loss is the value of
 the money, property, or services
 unlawfully taken; it does not, for
 
 example, include interest the victim
 
 could have earned on such funds had the
 
 offense not occurred. 
 

(Emphasis ours.) The question is whether, in light of the

interest preclusion statement in the commentary, the district

court erred in including finance charges and late fees in its

valuation of the loss.6 There can be little doubt that the

courts must follow the Guidelines commentaries. Stinson v.
 

United States, U.S. , 113 S.Ct. 1913, 1919 (1993).
 

 

6. Although the court did not state explicitly that these
charges were included such can be inferred from its comment
in its statement of reasons that the government objected to
the presentence report's recommendation of a two-level
increase because such recommendation failed to include "late
and finance" charges. See also Government's Brief at page 41
 
in which it is stated:

 The court accepted as accurate Hall's
 figures, which included only finance
 charges and late fees as of the dates of
 the termination of the accounts in 1990,
 . . . .

 -25-
 25

 We are not the first court to grapple with the

scope and application of the "interest" statement in

Commentary 7. In United States v. Henderson, No. 92-2707,
 

1994 U.S. App. LEXIS 7166 at *33 (5th Cir. April 13, 1994)

(footnote omitted) the court held:

 The current commentary to the Sentencing
 Guidelines provides that the amount of
 loss "does not, for example, include
 interest the victim could have earned on
 the funds had the offense not occurred."
 U.S.S.G. 2F1.1, comment. (n.7). We
 find that this commentary sweeps too
 broadly and, if applied in this case
 would be inconsistent with the purpose of
 2F1.1. Stinson v. United States, 123
 
 L. Ed. 2d 598, 113 S. Ct. 1913, 1919
 (1993). Interest should be included if,
 as here, the victim had a reasonable
 expectation of receiving interest from
 the transaction. See, e.g., United
 
 States v. Lowder, 5 F.3d 467, 471 (10th
 
 Cir. 1993) (holding that interest should
 be included in the amount of loss where
 the defendant promised victims a specific
 interest rate on their investments);
 United States v. Jones, 933 F.2d 353,
 
 354-55 (6th Cir. 1991) (interest should
 be included where the defendant defrauded
 credit card companies which had a
 reasonable expectation of a specific
 return on the credit extended). In the
 words of the district judge, "interest is
 a loss, a loss of earnings on money--
 representing a loss of earnings on money
 that was--that rightfully belonged to the
 bank and therefore should be also
 included." 11 R. 42-43. We find no
 error in the district court's decision to
 include interest in the amount of loss in
 this case.

In United States v. Lowder, 5 F.3d 467 (10th Cir. 1993) the
 

court reasoned:

 -26-
 26

 We interpret the guideline as disallowing
 "opportunity cost" interest, or the time-
 value of money stolen from victims.
 Here, however, Defendant defrauded his
 victims by promising them a guaranteed
 interest rate of 12%. He induced their
 investment by essentially contracting for
 a specific rate of return. He also sent
 out account summaries, showing the
 interest accrued on their investment.
 This is analogous to a promise to pay on
 a bank loan or promissory note, in which
 case interest may be included in the
 loss.

Id. at 471.
 

 In a case like this one, involving the fraudulent

use of unauthorized credit cards, the Sixth Circuit, in a per
 

curiam opinion held:
 

 We do not think it was error for the
 district court to include the interest
 charges in the calculation of the loss.
 When Ms. Jones made her purchases with
 the fraudulently obtained credit cards,
 the issuer advanced money to the retailer
 on her behalf. When Ms. Jones failed to
 pay, the issuer lost the use of the money
 that ought to have come back to it.
 Money has a time value, as all borrowers
 and lenders know, and the time value of
 the money withheld by Ms. Jones was fixed
 by the credit card agreements under which
 the interest was calculated.

United States v. Jones, 933 F.2d 353, 354 (6th Cir. 1991).
 

 This is a close issue and we must acknowledge that

there is to some degree a conflict between the cited cases

and the language of the Commentary. The conflict is due to a

clash between the ambiguous language used in the Commentary

and the complexity of what constitutes "interest" and when

 -27-
 27

it is an integral part of the value of the "money, property

or services unlawfully taken." Commentary 7. Our holding

will not solve the problem; such resolution lies with the

Sentencing Commission.

 We hold that in a case involving the fraudulent use

of unauthorized credit cards, finance charges and late fees

do not come within the meaning of the Commentary phrase

"interest the victim could have earned on such funds had the

offense not occurred". This phrase, we think, refers to

opportunity cost interest. In a credit card case there is an

agreement between the company and the cardholder to the

effect that when payments are made late, or not at all, the

cardholder is subject to late fees and finance charges. This

is part of the price of using credit cards. The credit card

company has a right to expect that such fees and charges will

be paid. This is not "interest that the victim could have

earned on such funds had the offense not occurred." It is a

contractual obligation on which the credit card company

relies each time it extends credit to a cardholder. In fact,

but for the cardholder's promise to pay late fees and finance

charges, the credit card company would not extend its credit

in the first instance. Such charges, therefore, are properly

included in the loss valuation.

 The judgment of the district court is affirmed in
 

all respects.
 

 -28-
 28